# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **JERRY M. ROBINSON,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:08CV1980MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. §405(g) for judicial review of the final decision of

Michael J. Astrue ("Defendant") denying the application for Disability Insurance Benefits under Title

II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act filed by Jerry M. Robinson ("Plaintiff"). Plaintiff has filed a brief in support of the

Complaint. Doc. 14. Defendant has filed a brief in support of the Answer. Doc. 16. Plaintiff has filed

a Reply. Doc. 18. The parties consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. §636(c)(1). Doc. 19.

## I.
## PROCEDURAL HISTORY

On January 10, 2005, Plaintiff filed applications for disability benefits alleging a disability

onset date of October 7, 2002. Tr. 111-113, 436-38. Plaintiff's applications were denied and he

requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 85-89, 448-52. After a

hearing[1] an ALJ found, on December 12, 2007, that Plaintiff was not disabled through the date of the

---

[1] Initially, Plaintiff appeared before the ALJ without counsel. Tr. 460-69. After
being informed by the ALJ that he was entitled to be represented, Plaintiff stated that he wanted

decision. Tr. 12-19.  Plaintiff filed a timely request for review with the Appeals Council. Tr. 8. The

Appeals Council denied Plaintiff's request for review on October 30, 2008. Tr. 3-6.  As such, the

decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

**A.    Plaintiff's Testimony:**

Plaintiff testified that, at the time of the hearing, he was fifty-one years old; that he had

completed high school;  that his past work included office cleaning; that he quit office cleaning in

2005 due to symptoms from asthma;  that when he worked at the cleaning service, he needed

someone to explain instructions to him because he could not read them; and that the reason he

continued to work was because he had no place to stay. Tr. 476-84.

Plaintiff further testified that he was last treated for asthma the week before the hearing; that

at the time of the hearing he was taking twelve different medicines; that he has problems breathing

after walking too long; that he had stopped smoking a month prior to the hearing when he was in the

hospital; that since quitting smoking, his asthma "is a little better, but it's still the same";  that he

stopped using cocaine for "going on three years"; that he went through a Salvation Army program;

that he had "probably" snorted cocaine at a party just prior to a statement given in March of 2006;

that he was clean from other drugs; that he had not used alcohol for about five years; and that he had

not had any mental health treatment. Tr. 478-80. Plaintiff also testified that his attorney sent him to

see Dean Rosen, Psy. D. Tr. 483.

---

counsel.  As such, the hearing was rescheduled for September 25, 2007.  On that date Plaintiff's
counsel appeared but Plaintiff did not. The hearing was rescheduled for October 24, 2007, at
which time both Plaintiff and his counsel were present. Tr. 474-89.

## B.       Vocational Expert Testimony:

Vocational Expert Brenda Young (the "VE") testified at the October 3, 2006 hearing.  The ALJ asked the VE to assume two hypothetical questions regarding Plaintiff's residual function capacity and his resulting ability to perform gainful activity.  In the first hypothetical the ALJ asked the VE to assume that:

> Hypothetical claimant can lift and carry up to 50 pounds occasionally, 25 pounds frequently, stand and walk for six hours out of eight, sit for six hours out of eight, does have limited reading skills and should avoid even moderate exposure to fumes, odors, dusts and gases.  In addition, he is able to understand, remember and carry out at least simple instructions and non-detailed tasks.

Tr. 485-86.

The VE responded that such an individual could not perform any of Plaintiff's past-relevant work; that such an individual could perform other work, such as a hand packer, packager, and dining room attendant; and that the hand packer, packager, and dining room attendant jobs were available in the St. Louis metropolitan area. Tr. 486.

In the second hypothetical, the ALJ asked the VE to assume the hypothetical person had:

> [M]arked [limitations with regard to][2] ability to cope with stress, marked [limitations with] ability to relate in social settings, marked [limitations with regard to] ability to perform at a consistent pace without an unreasonable number and length of rest periods—moderate [limitations] as far as being able to function independently, interact with the general public, accept instructions and respond to criticism, make simple work-related decisions and maintain attention and concentration for extended periods.

Tr. 487.

The ALJ stated that the second hypothetical was based on the Medical Source Statement completed by Dr. Rosen. Tr. 362-63.  The VE testified that an individual with the limitations

---

[2]       The ALJ did not include a reference to "limitations" in this hypothetical. However, as the ALJ was addressing the Medical Source Statement completed by Dr. Rosen, it is apparent that he intended the hypothetical to reference limitations in abilities.

described in the second hypothetical could not perform any work and that this conclusion is consistent with the Dictionary of Occupation titles.  Tr. 487.

### III.
### MEDICAL RECORDS

May 28, 2003 records of St. Louis University Hospital reflect that Plaintiff presented in the emergency room where he was treated for symptoms of acute asthma exacerbation; that Plaintiff had a history of asthmatic exacerbation; that Plaintiff's lungs were clear; that the heart and mediastinal silhouettes were normal; and that the airway appeared "unremarkable." Tr. 264-77, 293.

June 26, 2003 records of St. Louis University Hospital reflect that Plaintiff presented at the emergency room with complaints of a swollen right foot; that the treating physician diagnosed Plaintiff with gout; that examination showed no fracture or dislocation; that the impression was a "negative exam"; that Plaintiff was prescribed medication and told to use ice; and that he was released to return to work the next day. Tr. 257, 291.

July 4, 2003 records of St. Louis University Hospital reflect that Plaintiff presented in the emergency room for symptoms related to an asthma attack; that Plaintiff was instructed to stop smoking; and that, since May 2003, Plaintiff's lungs remained clear. Tr. 246-54, 289-91.

July 5, 2003 records of St. Louis University Hospital reflect that Plaintiff presented in the emergency for symptoms related to an asthma exacerbation, and that he was instructed to stop smoking.  A report from a PA and lateral chest exam, dated July 6, 2003, states that since May, "no change [was] appreciated"; that the lungs remained clear; that heart size was stable; and that the "hila, pleura, and bony thorax [were] unremarkable." Tr. 284-85.

July 7, 2003 records of Saint Louis University Hospital reflect that Plaintiff presented in the emergency room for symptoms related to an acute asthma exacerbation; that Plaintiff complained of chest tightness, shortness of breath, cough producing white sputum, and fatigue; that Plaintiff was

treated with Albuterol nebulizer while in the emergency room; that Plaintiff was kept in the hospital until July 8, 2003; and that the attending physician prescribed Albuterol, Protonix, and Nicorette to aid in smoking cessation. Tr. 226-37.

June 12, 2004 records of St. Louis University Hospital reflect that Plaintiff presented in the emergency room where he was treated for symptoms related to an asthma attack, and that Plaintiff was discharged in better condition. Tr. 216-25. A report from a PA and lateral chest exam, dated June 12, 2004, states that Plaintiff reported a history of chest pain and asthma attacks; that the lungs were "hyperinflated but clear of peripheral opacities;" that there was no plueral effusion or pneumothorax; that the cardiac and mediastinal silhouettes were normal; and that the bony thorax was intact. Tr. 286-88.

June 19, 2004 records of Saint Louis University Hospital reflect that Plaintiff presented in the emergency room for symptoms related to an asthma attack; that Plaintiff was treated with Albuterol and Ipratropium Bromide while in the emergency room; that the attending physician directed Plaintiff to take his medication as prescribed and return if symptoms worsened; and that Plaintiff was discharged in stable condition. Tr. 206-15.

July 4, 2004 records from Saint Louis University Hospital reflect that Plaintiff presented in the emergency room where he was treated for and asthma exacerbation; that Plaintiff was instructed to cease smoking; and that Plaintiff was discharged in stable condition. Tr. 195-205.

Dan Segal,[3] of the St. Louis Empowerment Center, stated in a March 12, 2005 Function Report - Third Party that he has known Plaintiff for four to five years; that Plaintiff goes outside "most of the day"; that he does not drive; that he is not able to pay bills, count change, or use a checkbook; that he has to be reminded to go places; that Plaintiff's "illness" does not affect his

---

[3] The record does not reflect Mr. Segal's position at the Empowerment Center.

memory, concentration, understanding, getting along with others, and his ability to follow instructions; that stress causes Plaintiff to have a "reduction of purpose"; and that Plaintiff tries to adapt to changes in routine. Tr. 159-67.

A Mental Residual Functional Capacity Assessment completed by Anne Kusheck, Ph.D., on May 3, 2005, states that Plaintiff is not limited significantly in regard to the ability to remember locations and work-like procedures, the ability to understand, remember, and carry out very short and simple instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities with a schedule, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to interact appropriately with the general public, the ability to ask simple questions and request assistance, the ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazzards and take appropriate precautions, and the ability to set realistic goals or make plans independently or others. Dr. Kusheck concluded that Plaintiff is moderately limited in his ability to understand, remember, and carry out detailed instructions; that he is able to understand, remember, and carry out simple instructions; and that he is otherwise unlimited from a mental perspective. Tr. 136-38.

Dr. Kusheck also completed a Psychiatric Technique Review Form on May 3, 2005, in which she reported that Plaintiff had a Binet IQ of 77 at age 12 and at age 14; that at age 18, Plaintiff had a WAIS IQ of 78; that Plaintiff has a history of substantial gainful employment at the unskilled work level; that his "psch allegations [were] related to his borderline IQ"; and that the limitations which the person from the Empowerment Center are "only partially credible because we do not know this person's alleged relation to [Plaintiff] or how well he knows him." Tr. 152.

February 7, 2006 records of Saint Louis University Hospital reflect that Plaintiff presented in the emergency room complaining of stomach and head pain; that Plaintiff was administered a CT

exam on his abdomen and pelvis with results showing that the liver, gallbladder, pancreas, spleen, kidneys, and osseous structures were "unremarkable"; and that the impression of the test results was a small bowel ileus and right atrial dilatation. Tr. 300-304.

March 6, 2006 records of Barnes Jewish Hospital ("BJH") Emergency Room reflect that Plaintiff was admitted due to acute asthma exacerbation; that Plaintiff said he last snorted cocaine a "couple of weeks ago"; that Plaintiff said he "normally use[d] his albuteral inhaler about three times a week"; that Plaintiff said that his albuterol inhaler "normally alleviates his symptoms"; that Plaintiff continued wheezing after a nebulizer was administered and he was given a dose of Prednisone; that Plaintiff was to start on a Flovent inhaler; and that Plaintiff "denie[d] any recent tobacco or drug use, although given his past history it is very possible that either crack cocaine or cigarette use could have been contributing to this current exacerbation." Tr. 343-44. A March 6, 2006 "Chest Radiography, Posteroanterior (PA), Lateral" exam report from BJH states that there was a "mild prominence" of the interstitial markings identified within the lung bases; that no focal pneumonia, pneumothorax, or pleural effusions were identified; that cardiac silhouettes were within normal limits; and that a mildly tortuous aorta was seen. Tr. 352.

BJH records, dated March 8, 2006, reflect that while Plaintiff was admitted another chest radiography, PA, and lateral exam were performed; that "tiny" bilateral pleural effusions were noted; that there no pneumonia, edema, pneumothorax, or pleural effusions were noted; and that the cardiomediastinal contours were normal. Tr. 351.

The Discharge Summary from BJH, dated March 9, 2006, states that Plaintiff improved symptomatically up until discharge; that his lung exam improved daily; that he continued to complain of dyspnea on exertion; that he was discharged home with medications including Albuterol, Azithromycin, Advair, and Prednisone; and that a social worker had worked with Plaintiff to arrange

for samples for all his medications and instructed him to follow-up with Connect Care Clinic to get refills. Tr. 345-50.

March 13, 2006 records of Saint Louis University Hospital reflect that Plaintiff presented complaining of chest pain and that a chest PA and lateral exam showed that Plaintiff's lungs were free of opacities; that there was no pleural effusion or pneumothorax; that the cardiomediastinal silhouette was within normal limits; that the bony thorax was intact; that the overall conclusion were normal chest exam results. Tr. 306-13.

March 19, 2006 records of BJH Emergency Room reflect that Plaintiff presented for symptoms related to an asthma attack; that he was speaking in full sentences without difficulty; that Plaintiff was administered a chest PA and lateral exam; that, since his prior examination, there was "very mild blunting of bilateral costophrenic angles"; that the test showed there were no effusions, infiltrates, or pneumothorax; and that the test showed Plaintiff's heart size was within normal limits and aorta was tortuous; that Plaintiff was treated with Albuterol, oxygen, and Atrovent; and that Plaintiff was discharged to home alert, oriented, and with no respiratory distress. Tr. 321-34.

April 18, 2006 records of Saint Louis University Hospital reflect that Plaintiff presented on that date; that he was treated for symptoms related to an asthma attack; that Plaintiff was administered a chest PA and lateral exam; and that since an examination in March, the lungs remained free of pathological opacities; that this test showed that there was no pneumothorax or pleural effusion present, that Plaintiff's heart size was normal and stable, and that osseous structures were intact; and that the test showed a tortuous aorta. Tr. 298-99.

January 11, 2007 records of Saint Louis University Hospital Emergency Room reflect that Plaintiff presented with complaints of testicular pain on the right testicle and that a sonogram showed that testes were normal in size, echogenicity, and vascularity; that no testicular mass was present; that

there was no torsion; that the right epididymis was slightly thickened without increased vascularity; that the left epididymis demonstrated mild increased vascularity "suggesting possible epididymitis"; and that small bilateral hydroceles and varicoceles were demonstrated. Tr. 316.  Medical records of this date further reflect that Plaintiff "request[ed] assistance with medication"; that Plaintiff qualified for "Medication Assistance on a One Time Only Basis"; and that Plaintiff was to make an appointment at the Grace Hill Clinic and become established as a patient there.  Tr. 315.

August 3, 2007 records of Saint Louis University Hospital reflect that Plaintiff presented in the emergency room complaining of onset of symptoms related to asthma, including shortness of breath and a cough producing white sputum; that Plaintiff was admitted to the hospital based on a diagnosis of asthma and chronic obstructive pulmonary disease and pneumonia; that computerized tomography ("CT") scan, dated August 4, 2007, showed bilateral lower lobe pneumonia; and that on August 9, 2007, Plaintiff was discharged in stable condition. Tr. 374-408.

August 21, 2007 records from Saint Louis University Hospital Emergency Room reflect that Plaintiff presented with symptoms related to asthma; that a chest PA and lateral exam was performed; that findings from the exam, as compared to an exam performed on August 8, 2007, showed that the lungs were clear, that the heart size was normal, that there was tortuosity of the aorta, that there were no hilar or mediastinal enlargement, that there was no pleural effusion or pneumothorax, and that the bones were "unremarkable"; and that Plaintiff was discharged with prescriptions for Fluticasone and Albuterol. Tr. 412-19.

On September 10, 2007, Plaintiff submitted to a random drug test administered by Global Drug Testing Services on behalf of his employer. The test report states that a drug panel and screening for alcohol were performed, and that Plaintiff was negative for all drugs tested and that no adulterations were detected. Tr. 318-19.

On September 17, 2007, Plaintiff underwent a psychological evaluation with IQ testing with Dr. Rosen. Dr. Rosen's report states that before the evaluation, Dr. Rosen reviewed Plaintiff's medical records from BJH and Saint Louis University Hospital, his work history, and his school records. Dr. Rosen's report further states that Plaintiff had a history of alcohol and drug use; that Plaintiff had not used for two years and had gone through a 12-month residential program for substance abuse sponsored by the Salvation Army; that Plaintiff was cooperative, appropriately dressed in a clean red shirt and shorts, well groomed, and had "excellent hygiene"; that Plaintiff related easily with Dr. Rosen "in a polite and deferential manner"; that he understood the purpose of the evaluation; that during the interview Plaintiff's thoughts were "generally logical, consistent and coherent"; that Plaintiff displayed no thought disorder and "gave no evidence of any other loose associations, ... push of speech, grandiosity, religiosity, current delusions or hallucinations"; that Plaintiff said he had hallucinations in the past "but state[d] that the medication he takes to keep calm stops them"; that Plaintiff was appropriate in the content of his thoughts; that Plaintiff "displayed sufficient attention, concentration and motivation to persevere with the testing despite the difficulty of many items"; that Plaintiff said he can cook simple meals for himself, shop, and use money when shopping and "thought he could be sure of getting correct change though his math skills are very basic at about third grade level"; that Plaintiff reported the incorrect year of his birth and misstated his age; that Plaintiff could not read the informed consent form; that during the interview, Plaintiff's "thoughts were generally logical, consistent, and coherent"; that "he displayed no thought disorder and gave no evidence of any other loose associations, tangentiality, circumstantiality, push of speech, grandiosity, religiosity, current delusions or hallucinations"; that when Dr. Rosen asked Plaintiff about any diagnosis of hyperactivity, Plaintiff responded with a "history of his irregular heartbeat"; and that Plaintiff "displayed sufficient attention, concentration and motivation to persevere with the testing

despite the difficulty of many items"; that Plaintiff reported a diminished appetite, weight loss, loss of energy, loss of stamina, problems concentrating and crying spells, which are symptoms of depression; that Plaintiff had IQ testing scores of 77 and 78 at ages 15 and 19, respectively; that Dr. Rosen administered the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III") to Plaintiff; that Plaintiff obtained a full-scale IQ score of 65, a verbal IQ score of 66 and a performance IQ score of 70; that "[Plaintiff's] overall IQ score [was] somewhat lower than his measured intelligence as a young man using different assessment instruments"; and that Plaintiff's test scores "appear[ed] to be a reliable and valid estimate of [Plaintiff's] current intellectual functioning"; and that Dr. Rosen assigned Plaintiff a Global Assessment Functioning ("GAF") score of 55.[4] Tr. 254-59.

Dr. Rosen completed a Medical Source Statement, dated September 18, 2007, in which Dr. Rosen reported that Plaintiff had mild symptoms in regard to: behaving in an emotionally stable manner, maintaining reliability, maintaining socially acceptable behavior, working in coordination with others, understanding and remembering simple instructions, maintaining regular attendance and being punctual, and sustaining an ordinary routine without special supervision. Dr. Rosen identified moderate limitations in regard to Plaintiff's abilities to: function independently, interact with the general public, accept instructions, respond to criticism, make simple work-related decisions, and maintain attention and concentration for extended periods. Dr. Rosen reported that Plaintiff has

---

[4]    Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

marked limitations in regard to his abilities to: cope with stress, relate in social settings, and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Rosen identified no extreme limitations in regard to any area of functioning.

Dr. Rosen also stated in the September 18, 2007 Medical Source Statement that Plaintiff had not suffered a substantial loss with regards to his ability to understand, remember, and carry out simple instructions; that Plaintiff had suffered a substantial loss regarding his ability to make judgments that are commensurate with the functions of unskilled work, to respond appropriately to supervision, and to deal with changes in a routine work setting; that Plaintiff's limitations had lasted twelve continuous months, or could be expected to last 12 continuous months at their assessed severity; that Plaintiff had functioned at lower levels since entering adulthood; and that Plaintiff was "now functioning somewhat higher [in] the past year." Tr. 362-63.

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more

than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § §416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the

Commissioner at step five."); <u>Charles v. Barnhart</u>, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. <u>Clark v. Heckler</u>, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002). <u>See</u> <u>also</u> <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007). In <u>Bland v. Bowen</u>, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

<u>Id.</u> at 535. <u>See</u> <u>also</u> <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996)); <u>Hartfield v. Barnhart</u>, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. <u>Cox</u>, 495 F.3d at 617; <u>Guillams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005); <u>McClees v. Shalala</u>, 2 F.3d 301, 302 (8th Cir. 1994); <u>Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001) (citing <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. <u>Benskin v. Bowen</u>,

830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992)

(holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial

evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject

to reversal merely because substantial evidence may also support an opposite conclusion or because

the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations

omitted). See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.

2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d

707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence,

the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v.

Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical impairment which can be expected  to result

in death or has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir.

1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d

882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892

F.2d at 750.

# V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final

determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is

substantial evidence that would support a decision opposite to that of the Commissioner, the court

must affirm his decision as long as there is substantial evidence in favor of the Commissioner's

position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the decision of the ALJ is not supported by substantial evidence

because the ALJ found that Plaintiff did not meet Listing 12.05(C); because the ALJ improperly used

Plaintiff's performance of substantial gainful activity to discredit his current IQ scores; because the

ALJ failed to give proper weight to the opinion of Dr. Rosen, a consulting psychologist; and because

the opinion of the VE conflicted with the Dictionary of Occupational Titles.

## A.      Listing 12.05(C) and Dr. Rosen's Opinion:

Plaintiff contends that the ALJ erred in finding that he does not meet Listing 12.05(C) for

mental retardation. In the matter under consideration the ALJ found that Plaintiff had the severe

impairments of borderline intellectual functioning and asthma. The ALJ found, however, that the

combined effects of Plaintiff's impairments did not meet or equal an impairment found at 20 C.F.R.

Part 404, Subpart P., Appendix 1, the Listing of Impairments. Plaintiff contends that he meets Listing

12.05(C) for mental retardation, and, in particular, that he has met all three requirements of this listing

as discussed below.

First, it the difference between borderline intellectual functioning and mental retardation is

significant. As stated by the court in Roberts v. Apfel, 222 F.3d 466, 470 n.3 (8th Cir. 2000):

> Borderline intellectual functioning is a condition defined as an IQ score within the
> 71-84 range, while mental retardation is a score of about 70 or below. See American
> Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders,
> 39-40, 684 (4th ed.1994). "To put the term [borderline intellectual functioning] in
> perspective, the Social Security Administration considers a person with an IQ of 59
> or less presumptively disabled," Thomas v. Sullivan, 876 F.2d 666, 668 n. 1 (8th
> Cir.1989), and a person with an IQ of 60 through 70 with some other physical or
> mental impairment imposing work-related limitations presumptively disabled. 20
> C.F.R. Part 404, Subpt. P, App. 1, 12.0.

20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 §12.00(a) lists mental disorders in diagnostic

categories, which include, among others, mental retardation, § 12.05. As stated by the Eighth Circuit

in Clay v. Barnhart, 417 F.3d 922, 928-29 (8th Cir. 2005):

> Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental
> retardation as, "significantly subaverage general intellectual functioning with deficits
> in adaptive functioning initially manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment before age 22." **To show
> a sufficiently severe disorder under subsection (C) of Listing 12.05, an applicant
> must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and
> a physical or other mental impairment imposing additional and significant
> work-related limitation of function."** We have emphasized in the past that IQ
> scores must be valid, that the **Commissioner need not rely exclusively on IQ
> scores**, and that the Commissioner may disregard test scores that are inconsistent with
> an applicant's demonstrated activities and abilities as reflected in the record as a
> whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir.2001); Clark v. Apfel, 141 F.3d
> 1253, 1255 (8th Cir.1998).

(emphasis added).

Listing 12.05 states that to meet the required level of severity for mental retardation under

Listing 12.05, a claimant must show that the requirements of A, B, or C are met. Listing 12.05(C)

requires the following:"[a] valid verbal, performance, or full scale IQ of 60 through 70" and a

"physical or other mental impairment imposing an additional and significant work-related limitation

of function." As further explained in Masesh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006):

[T]he requirements in the introductory paragraph [of Listing 12.05] are mandatory. The overall introduction to the mental disorders section states: "Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." Id at § 12.00. The cases [the claimant] cites are not to the contrary, because they do not discuss whether the introductory paragraph is mandatory. [citations omitted] Under the plain language of the regulations, a claimant must demonstrate or support onset of the impairment before age 22.

> ...

In sum, to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.

In regard to a claimant's being found disabled as a result of a mental disorder, whether it be mental retardation or some other condition, 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a.  A special procedure must be followed at each level of administrative review.  See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam). The mere existence of a mental condition, however, is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a.  The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. 20  C.F.R. § 404.1520a(b)(1).  These are gleaned from a mental status

exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § § 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R.§ 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, the Commissioner will "generally concluded that [a claimant's] impairments are not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

The court notes that upon finding that Plaintiff did not meet the listing for mental retardation, the ALJ considered the medical evidence, as required by the first step of a mental impairment analysis. See Pratt, 956 F.2d at 835; 20 C.F.R. §§ 404.1520a(b)(1), 404.1508. With regards to Plaintiff's alleged mental retardation, the ALJ considered that Plaintiff was found to have *mild* restrictions or difficulties in social functioning, concentration, persistence or pace and found that these findings also fall short of the requirements of the listing. Tr. 15. Such a finding supports a conclusion that Plaintiff's mental impairment is not severe. See 20 C.F.R. § 404.1520a(d)(1).

The ALJ also considered that Plaintiff's more recent IQ score was inconsistent with earlier scores without anything in the record showing that Plaintiff had any illness, injury, or circumstances that would lead to a decrease in cognitive functioning. Tr. 17. The ALJ considered that Plaintiff's school records showed that Plaintiff had "borderline IQ scores" and that he had a full scale score of 78. Indeed, the record reflects that when Plaintiff's IQ was tested while he was in high school his score was in the range for borderline intellectual functioning as it was reported to be 77 when he was twelve, fourteen and/or fifteen and 78 when he was eighteen and/or nineteen.[5] Dr. Rosen reported that his testing of Plaintiff reflected that Plaintiff had a full scale score of 65. "[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." Muncy v. Apfel, 247 F.3d 728, (8th Cir. 2001) (citing Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir.1985) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); Sird v. Chater, 105 F.3d 401, 402 n. 4 (8th Cir.1997)). Further, it is significant that Plaintiff was able to complete high school. See Maresh, 438 F.3d at 900 (finding the claimant met the requirements of Listing 12.05(C), where

---

[5]     Dr. Rosen's records reflect that Plaintiff was tested when he was fifteen and nineteen and Dr. Kusheck's report states that Plaintiff was tested when he was twelve, fourteen and eighteen.

he dropped out of school in the ninth grade and that his impairment "manifested itself during his developmental period").

To the extent that the ALJ discounted Dr. Rosen's report, Dr. Rosen was a one-time examining source. It is well settled that the report of a consulting physician who has seen the claimant only once is of little significance by itself. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). See also Turpin v. Bowen, 813 F.2d 165, 170 (8th Cir. 1987) ("[T]he report of a consulting physician who examine[s] [a] claimant once does not constitute 'substantial evidence' upon the record as a whole"); Piercy v. Bowen, 835 F.2d 190, 191 (8th Cir. 1987). Moreover, the opinion of Dr. Kusheck, who evaluated Plaintiff based on the record, is consistent with the findings of the ALJ.

Moreover, in regard to Plaintiff's Performance IQ score, Dr. Rosen reported that Plaintiff's score was 70, which is merely one point below the range applicable to borderline intellectual functioning. To the extent the ALJ discredited the IQ scores reported by Dr. Rosen, "[a]n ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." Muncy, 247 F.3d at 733 (citing Clark v. Apfel, 141 F.3d 1253, 1255-56 (8th Cir.1998)).

Upon finding that Plaintiff does not meet Listing 12.05(C), the ALJ also considered that Plaintiff has never received any type of treatment from a mental health profession for depression or any other type of psychiatric treatment. Tr. 18. Seeking limited medical treatment is inconsistent with claims of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment."); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."); Nelson v.

Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's failure. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). In Plaintiff's case, the court notes that he was referred to Grace Hill in 2007, although the record does not reflect that Plaintiff sought treatment there after the referral.[6]

Even if a claimant has an IQ score within the range specified by Listing 12.05(C), to be found disabled, his IQ must have a "'more than slight or minimal' effect on [the claimant's] ability to perform work.'" Jones v. Barnhart, 335 F.3d 697 (8th Cir. 2003) (quoting Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (internal citation and quotation omitted). Consistent with the requirement of § 404.1520(a), after considering the medical evidence, the ALJ proceeded to consider Plaintiff's functional limitations. In particular, the ALJ considered that Plaintiff worked in the past at the substantial gainful activity level and performed simple work activities. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th Cir. 2001). "Working generally demonstrates an ability to perform a substantial gainful activity." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)). 20 C.F.R. § 404.1574(a) provides that if a claimant has worked, the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity. Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

---

[6] The record reflects that Plaintiff was seen in April 2006, as a dental patient, at Grace Hill. Tr. 294.

The ALJ also considered that Plaintiff testified he stopped working, not because of mental deficiencies, but because he could not tolerate conditions due to his asthma. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Goff, 421 F.3d at 793 (citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). Significantly, Plaintiff does not challenge the ALJ's finding that his asthma did not preclude him from engaging in substantial gainful employment. To the extent that Plaintiff cannot be exposed to respiratory irritants, the ALJ included this limitation in Plaintiff's residual functional capacity.

To the extent that the ALJ found that Plaintiff has only mild restrictions of his daily activities and social functioning and moderate limitations in regard to concentration and persistence or pace, the court finds that these conclusions are supported by substantial evidence. Indeed, Mr. Segal from the St. Louis Empowerment Clinic, who had known Plaintiff for four to five years, did not report that Plaintiff had problems in regard to concentration, understanding, following instructions, and getting along with others, although he did report that Plaintiff had other difficulties, including reading and completing tasks. In fact, Mr. Segal reported that Plaintiff was able to take care of his personal needs, was well groomed, and can travel alone. Further, Dr. Rosen reported that Plaintiff was appropriately dressed, well groomed, displayed excellent hygiene, cooperative, understood the purpose of the examination, and had logical, consistent, and coherent thoughts during Dr. Rosen's interview. Additionally, the ALJ findings in regard to Plaintiff's daily activities, social functioning, concentration and persistence or pace are consistent with the reports of Dr. Kusheck.

To the extent that the ALJ did not address every detail of Dr. Rosen's report, an ALJ's failure to cite specific evidence, does not indicate that such evidence was not considered. See Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995). See also Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because

the record supports her overall conclusion.") (citations omitted); Wheeler v. Apfel, 224 F.3d 891,

896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an

ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite

specific evidence does not indicate that such evidence was not considered"). To the extent Plaintiff

contends that the ALJ did not fully explain his reasoning in finding that Plaintiff did not meet Listing

12.05(C), an "arguable deficiency in opinion-writing technique," does not require a court to set side

an administrative finding when that deficiency had no bearing on the outcome. See Reynolds v.

Chater, 82 F.3d 254, 258 (8th Cir. 1996); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996);

Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). The court finds that neither the ALJ's failure

to discuss every detail of Dr. Rosen's report or any failure by the ALJ to fully explain his reasoning

did not affect the outcome of Plaintiff's case.

As noted by the Appeals Council, Listing 12.05 refers to "significantly subaverage general

intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period." As such, a claimant must have the required deficits in adaptive functioning

prior to age 22. Tr. 4. See also Maresh, 438 F.3d at 899 ("Under the plain language of the

regulations, a claimant must demonstrate or support onset of the impairment before age 22.").

Indeed, the requirements of 12.05 are mandatory. See id. As discussed above, Plaintiff's IQ scores,

while he was in high school, were above the levels indicated for mental retardation and were within

the range indicated for borderline intellectual functioning.

To the extent that Plaintiff contends that the ALJ failed to account for the special instructions

and supervision he alleges he required while he worked, these limitations are consistent with those

in the ALJ's first hypothetical to the VE, as described above, as the hypothetical assumed that the

person had limited reading skills and the ability to understand, remember, and carry out simple instructions and non-detailed tasks.

For the foregoing reasons the court finds that the ALJ gave proper weight to the opinion of Dr. Rosen and that the ALJ gave sufficient reasons to discount Dr. Rosen's opinion. Further, the court finds that the ALJ's decision that Plaintiff does not meet or equal Listing 12.05(C) is supported by substantial evidence on the record.

## B.       The ALJ Properly Relied on the Testimony of the Vocational Expert:

Plaintiff contends that the ALJ erroneously relied on the VE's testimony because it conflicted with the Dictionary of Occupational Titles ("DOT"). In particular, Plaintiff contends that the jobs of hand packer and dining room helper are reasoning level two jobs, which are precluded based on the hypothetical posed to the VE.

As noted on page 3, the ALJ posed the following hypothetical to the VE:

Hypothetical claimant can lift and carry up to 50 pounds occasionally, 25 pounds frequently, stand and walk for six hours out of eight, sit for six hours out of eight, does have limited reading skills and should avoid even moderate exposure to fumes, odors, dusts and gases. In addition, he is able to understand, remember and carry out at least simple instructions and non-detailed tasks.

Tr. 485-86.

The ALJ found that Plaintiff has the RFC to perform medium work "except that he is limited to simple, routine and repetitive work" and must avoid even moderate exposure to respiratory irritants. The ALJ posed a hypothetical to the VE which included the limitations which the ALJ found credible. In fact, the hypothetical, upon which the ALJ relied, was more restrictive than the RFC which the ALJ assigned to Plaintiff. The VE testified that, although the hypothetical person could not perform Plaintiff's past relevant work, there was work in the economy which a person with the limitations described in the hypothetical could perform. As such, according to the VE, there is work

in the economy which a person even more restricted than Plaintiff can perform. Based on the testimony of the VE, the ALJ found that Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

First, the court notes that an ALJ is required to include only those limitations in a hypothetical to a VE which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). The hypothetical posed to the VE in the matter under consideration, was, therefore, based on substantial evidence and consistent with Regulations and case law.

Even though a VE does not specifically recite factors in his answers, an ALJ can properly assume that the vocational expert "framed his answers based on the factors the ALJ told him to take into account." Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991). Where an ALJ's

hypotheticals included all of a claimant's impairments as supported by the record, and the expert limited his opinion in this regard, an ALJ properly relies on the VE's testimony. Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995).

Plaintiff contends that the hypothetical to the VE failed to account for the need for special instructions and supervision which he was afforded at his prior job. As the hypothetical posed to the VE specified that the claimant had *limited* reading skills and the ability to understand, remember, and carry out *simple* instructions and non-detailed tasks, the hypothetical was consistent with Plaintiff's restrictions in regard to instructions and supervision. As such, the court finds that the hypothetical posed to the VE and upon which the ALJ relied is consistent with the Regulations and case law and that it was supported by substantial evidence on the record.

To the extent that Plaintiff contends that the jobs which the VE said the hypothetical person could perform are level two jobs which are precluded by the hypothetical and that, therefore, the testimony of the VE conflicted with the DOT, the Eighth Circuit has recognized that DOT reasoning levels of two and three are consistent with unskilled work. Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007). Neither reasoning level two nor three conflicts with the specific limitations the ALJ specified in his hypothetical, as reasoning level three is consistent with limitations to simple, repetitive and routine tasks, a limitation more stringent than that included in the hypothetical. See Hillier v. Social Security Administration, 486 F.3d 359, 367 (8th Cir. 2007) (holding that an expert's opinion that claimant who was limited to following "simple, concrete instructions" could work as a cashier was not inconsistent with DOT's description of cashier as requiring level three reasoning). Reasoning level two has also been found to be consistent with limitation to "simple and routine" tasks. See Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir.2005) (holding that level-two reasoning is consistent with plaintiff's RFC to "simple and routine work tasks"); Money v. Barnhart, 91 Fed.

Appx. 210, 214 (3rd Cir. 2004) (holding that reasoning level two is consistent with restriction to simple, routine and repetitive work).

Moreover, the VE testified that his findings were consistent with the Dictionary of Occupational Titles. The court has found that the ALJ's first hypothetical to the VE set forth all of Plaintiff's physical and mental impairments which the ALJ found credible. Under such circumstances, including the VE's statement regarding consistency with the Dictionary of Vocational Titles, the VE testimony constitutes substantial evidence supporting the ALJ's decision. See Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). As such, the court finds that the ALJ properly relied on the testimony of the VE and that his decision is supported by substantial evidence in this regard.

## VI.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint is **DENIED;** Doc. 1, Doc. 14

**IT IS FURTHER ORDERED** that separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/ Mary Ann L. Medler
MARY ANN L. MEDLER
Dated this 4th day of February, 2010.      UNITED STATES MAGISTRATE JUDGE